1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

ROBERT BOULE,

               Plaintiff,

    v.

ERIK EGBERT and JANE DOE EGBERT
and their marital community,

               Defendants.

ERIK EGBERT,

               Counterclaimant,

    v.

ROBERT BOULE,

               Counterdefendant.

No. 2:17-cv-00106-RSM

DECLARATION OF GEOFFREY M.
GRINDELAND IN SUPPORT OF AGENT
EGBERT'S MOTION FOR SUMMARY
JUDGMENT

NOTED ON MOTION CALENDAR:
July 27, 2018

      I declare under penalty of perjury under the laws of the United States that I am over the

age of 18 and am otherwise competent to testify, and that the following is true and correct.

      1.     I am one of the attorneys for Agent Egbert in this matter.

DECLARATION OF GEOFFREY M. GRINDELAND IN SUPPORT
OF AGENT EGBERT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:17-cv-00106-RSM) - 1

LAW OFFICES OF
MILLS MEYERS SWARTLING P.S.
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

1    2.    Attached as **Exhibit A** are copies of excerpts from the transcripts of the

2    deposition of Robert Boule taken March 9, 2018, and May 31, 2018.

3    3.    Attached as **Exhibit B** are copies of excerpts from the transcript of the

4    deposition of former Supervisory Border Patrol Agent Kenneth Anderson taken June 1, 2018.

5    4.    Attached as **Exhibit C** are copies of excerpts from the transcripts of the

6    deposition of Border Patrol Agent Philip Olson taken April 5, 2018, and June 1, 2018.

7    Signed this 5th day of July 2018 at Seattle, Washington.

8

9    By: _____

10   Geoffrey M. Grindeland

11

12

13

14

15

16

17

18

19

20

21

22

23

DECLARATION OF GEOFFREY M. GRINDELAND IN SUPPORT
OF AGENT EGBERT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:17-cv-00106-RSM) - 2

LAW OFFICES OF
**MILLS MEYERS SWARTLING P.S.**
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

Breean Lawrence Beggs: bbeggs@pt-law.com, hhoffman@pt-law.com, lswift@pt-law.com

Gregory Donald Boos: gdboos@cascadia.com, gdboos@gmail.com

W. Scott Railton: srailton@cascadia.com

Kristin Berger Johnson: kristin.b.johnson@usdoj.gov, amy.hanson@usdoj.gov, CaseView.ECF@usdoj.gov, ECF-Civ.USAWAW@usdoj.gov, hana.yiu@usdoj.gov

I further certify that I mailed a true and correct copy of the foregoing to the following non-CM/ECF participants by U.S. Mail:

N/A

DATED: July 5, 2018


*s/Karrie Fielder*
Karrie Fielder

DECLARATION OF GEOFFREY M. GRINDELAND IN SUPPORT
OF AGENT EGBERT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:17-cv-00106-RSM) - 3

LAW OFFICES OF
**MILLS MEYERS SWARTLING P.S.**
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF WASHINGTON

 3                    AT SEATTLE
   _____
 4
   ROBERT BOULE,                      )
 5                  Plaintiff,        )
                                      )
 6        vs.                         )   2:17-cv-00106-RSM
                                      )
 7   ERIK EGBERT and JANE DOE         )
     EGBERT and their marital         )
 8   community,                       )
                    Defendants.       )
 9   _____  )
     ERIK EGBERT,                     )
10              Counterclaimant,      )
                                      )
11        vs.                         )
                                      )
12   ROBERT BOULE,                    )
                Counterdefendant.     )
13   _____

14         DEPOSITION UPON ORAL EXAMINATION OF

15             ROBERT JOSEPH JOHN BOULE

16   (CONTAINS CONFIDENTIAL TESTIMONY SUBJECT TO PROTECTIVE

17         ORDER AND FOR ATTORNEYS' EYES ONLY)
   _____
18
                    10:30 A.M.
19
                  March 9, 2018
20
              CASCADIA CROSS-BORDER LAW
21
           1305 11th Street, Suite 301
22
              BELLINGHAM, WASHINGTON
23

24

25   REPORTED BY: JUDY BONICELLI, RPR, CCR 2322
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**Exhibit A**

 1    clean up to the amount of rooms it is licensed for

 2    today.

 3        Q.   And you've been the sole owner of the property

 4    since you bought it in 2000?

 5        A.   Yes, yes.

 6        Q.   And you call your business the Smuggler's Inn,

 7    correct?

 8        A.   Smuggler's Inn Bed and Breakfast.

 9        Q.   Is the business incorporated?

10        A.   No.  It's a sole proprietor.

11        Q.   So it's your sole proprietorship doing

12    business as Smuggler's Inn Bed and Breakfast?

13        A.   That's correct.

14        Q.   When did you first notice people crossing the

15    border via your property?

16        A.   Probably within the first 90 days, and again,

17    it was not them crossing the property.  It was people

18    in the yard, on the property; and we would question

19    them, you know, "Can we help you?  What are you doing

20    in our yard?"  That type of thing.

21        Q.   And what -- do you recall the first person you

22    found in your yard?

23        A.   I do not.

24        Q.   Do you recall why they said they were in your

25    yard?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.   A lot of people were just -- at that point we
 2   were fixing up the yard, fixing up the house, and they
 3   said that they were curious on what was going on in the
 4   house.  Some of them were neighbors.  Some of them did
 5   not identify themselves.  When we bought the house,
 6   blackberries were up, the lawn was waist high, and so
 7   any time that anything is done, you have people,
 8   looky-loos, coming to see what was going on.
 9        Q.   But within the first 90 days of owning the
10   property, you became aware that there were sometimes
11   people crossing the border via the property, right?
12        A.   Yes.
13        Q.   Both directions north and south?
14        A.   North and south.
15        Q.   And you're aware that became a much bigger
16   deal after the terrorist attacks in September of 2001,
17   right?
18        A.   Dramatically.  We had a driveway that went
19   both ways when I bought the property.  They had a
20   Canadian vehicle that they parked on the Canadian side,
21   and he worked -- the previous owner worked in downtown
22   Vancouver, and they had an American car on the U.S.
23   side.  And we used to walk and have coffee with the
24   neighbors across the street.  911 hit, and that no
25   longer was something that we could do.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

8       Q.  Have you ever alerted government agents that

9   you thought someone was smuggling drugs?

10       A.  Yes.

11       Q.  When is the last time you did that?

12       A.  That's an ongoing situation.  We had drugs in

13   our home in November of this year.  Gentleman came in

14   with $500,000 worth of drugs in a duffle bag.  He then

15   left and said he was going to get another duffle bag.

16   We called the agent in charge to let them know that it

17   was ongoing.

18           The home [sic] then had 19 ICE agents search

19   the home.  There were four on the Canadian side and

20   four outside.  He did not return.  They -- he -- they

21   asked if the drugs were mine, and I told them -- or if

22   the backpack was mine, and I told them no.  And they

23   asked for permission to open the backpack or the duffle

24   bag and -- which they did, and they seized the drugs

25   inside.  And then they took the duffle bag.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   swimming, rifle range, regular scout camp activities.
 2        Q.  When was the last time you were in touch with
 3   Mr. Locke?
 4        A.  Within the last three years.
 5        Q.  On what occasion?
 6        A.  Let's see, it was after he had been appointed
 7   ambassador to China, and he is working with a law firm
 8   that my goddaughter's husband is managing partner in
 9   Portland.  And he -- it's Davis Wright Tremaine, and
10   Gary is working with Oregon wine industry to work with
11   getting wine from Oregon into China, as well as other
12   items with the State of Washington.
13        Q.  Has Mr. Locke ever helped you with your
14   business in any way?
15        A.  Yes.
16        Q.  In what way?
17        A.  Gary and I have been good friends for many,
18   many years, and his parents -- he's got a wonderful
19   sense of humor, and I was turned down for a license
20   application.
21            And so I gave Gary a phone call and asked him
22   if he could intercede in my behalf for a favor, and he
23   said he would try and was able to get the license plate
24   that I wanted.
25            We got a call from the head of the Department
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  of Licensing, and he was a little bit upset with me,

2  but they -- couple weeks later, we received the license

3  plate S-m-u-g-l-e-r, and that's on my vehicle today.

4          Q.  So when you first -- you applied for a vanity

5  plate?

6          A.  Yes, and we were turned down.

7          Q.  A vanity plate S-m u-g-l-r?

8          A.  L-e-r.

9          Q.  S-m-u-g-l-e-r.

10         A.  Right.

11         Q.  Smugler but with only one G?

12         A.  Right.

13         Q.  Is that because two Gs won't fit?

14         A.  That's correct.

15         Q.  And the Department of Licensing rejected the

16  application at first?

17         A.  They did, yes.

18         Q.  Why?  Why did they reject it?

19         A.  They didn't feel that it was appropriate.

20         Q.  Because it implied criminal activity?

21         A.  They didn't say that.  They just said that

22  they didn't think that it fit the vanity plate program

23  that they were putting out, and we were able to -- Gary

24  was able to ask them to put it through, and it went

25  through.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  with the room.  So we have -- if they are in a $350

2  room, it may be 250 and a hundred for the shuttle

3  pickup to create that 350.

4      Q.  What's the most you've ever charged for a

5  room, Mr. Boule?

6      A.  We charge for weddings, for a total package of

7  everything at the property, and it depends on if they

8  get tables and chairs and setup and the shuttle

9  service.  It just depends on what the activity is.

10      Q.  Okay, I'm asking about a guest room.  For a

11  night's stay in a guest room, what is the most you've

12  ever charged?

13      A.  700.

14      Q.  Which room was that for?

15      A.  It can be the Dirty Dan Harris.  It can be the

16  Office Suite.  It can be the Carriage House, and the

17  Carriage House sleeps up to 30.  We do sports teams

18  that we will do 55 dollars a night per person.

19          And so we can get up to -- if we have 30

20  people in the room, including breakfast, there could be

21  up to 1650 that they would pay for the room, $55 each

22  times 30.

23      Q.  And they would stay in a group like that would

24  stay in the Office Suite or the Carriage House?

25      A.  Yes.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

ROBERT BOULE - CONFIDENTIAL/AEO; March 09, 2018                74

1       A.  Yes.

2       Q.  Do you know how much Semiahmoo Resort charges

3  for a bed with a King bed in it and a private bath?

4       A.  Normally 169 to 350.

5       Q.  So you sometimes charge more than Semiahmoo

6  Resort for a similar room?

7       A.  Yes.

8       Q.  How come?

9       A.  If we have the Zach Brown Band at our

10  location, they will rent out the whole thing.  They

11  want privacy.  They want exclusivity for the rooms, and

12  we are able to provide that.  There are high-end guests

13  that want more privacy than what Semiahmoo can provide

14  having 199 rooms.

15      Q.  Do you monitor your on-line reviews on Yelp?

16      A.  I look at them.  I don't monitor them.  I

17  don't worry about them.  Some are good, and some are

18  not.

19      Q.  You've seen some of the bad reviews --

20      A.  Yes.

21      Q.  -- on Yelp?

22      A.  Yes.

23      Q.  Do you remember what issues reviewers

24  complained about?

25      A.  We had two nurses that complained, and they

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1          Q.  All right, let's go off the record.

 2                  (Recess taken 2:44 p.m. to 2:49 p.m.)

 3                  (Exhibit No. 6 marked for

 4   identification.)

 5    BY MR. GRINDELAND:

 6          Q.  Mr. Boule, handing you what has been marked as

 7   Exhibit 6 to your deposition, is that a photo of what

 8   you call the Carriage House at the Smuggler's Inn?

 9          A.  Yes.

10          Q.  The backside, so from like you're standing on

11   Zero Avenue?

12          A.  Yes.

13          Q.  And what part -- tell me about the Carriage

14   House.  I know you have a large guest room you call the

15   Carriage House room, right?

16          A.  Uh-huh.

17          Q.  Is that on the ground floor or the second

18   floor?

19          A.  The Carriage House room is on the ground

20   floor.

21          Q.  What is on the second floor?

22          A.  The Office Suite and then the bar.

23          Q.  Does anyone reside in the Carriage House?

24          A.  It depends on what time of year.

25          Q.  What times of year does somebody reside in the
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   Carriage House?

2       A.  When we rent it out.  Whether it be weekly or

3   monthly, or we have rented it out a year at a time.  We

4   do it during the summer monthly.  We do it by the day.

5   It depends on what the economy is.

6       Q.  Was anybody renting the Carriage House back in

7   March of 2014?

8       A.  Yes.

9       Q.  Who?

10      A.  Jason Surowiecki and Hope Wolf were up in the

11  Carriage House -- in the Office Suite.

12      Q.  I didn't hear Hope's last name.

13      A.  Wolf.

14      Q.  Is there an E on the end of Wolf?

15      A.  No.

16      Q.  Do you know if Ms. Wolf saw or heard any of

17  the events that this lawsuit is about?

18      A.  No.  She was at work that day.

19              (Exhibit No. 7 marked for

20  identification.)

21   BY MR. GRINDELAND:

22      Q.  Handing you what has been marked as Exhibit 7

23  to your deposition, do you recognize that to be a photo

24  of the Smuggler's Inn, right?

25      A.  Yes.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Q.  And was it clear to you that Agent Egbert had

2  told you to get out of his way so he could talk to

3  Mr. Fikert?

4      A.  Yes.

5      Q.  And you clearly told him no?

6      A.  No.

7      Q.  "I'm not getting out of your way"?

8      A.  Right.

9      Q.  Then he grabbed you by your chest, by the

10  clothing on your chest?

11      A.  Yes.

12      Q.  Lifted you up off the ground and threw you

13  into the Yukon?

14      A.  Yes.

15      Q.  Threw you against the side of the Yukon?

16      A.  Yes.

17      Q.  Like the passenger door, is that what you're

18  saying?

19      A.  That's where we were standing, yes.

20      Q.  I'm sorry, I think I asked this, but I don't

21  remember what your answer was.  How far away from the

22  Yukon were you standing when he picked you up?

23      A.  Six to eight inches.

24      Q.  So less than a foot?

25      A.  Less than a foot.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1     Q.  And when he threw you against the Yukon, did

2  he let go of you, or did he still hold onto you when

3  you were pressed up against the Yukon?

4     A.  He let go of me.  Then stepped back, and then

5  we stood there.  And then he again -- you know, by that

6  time I was yelling at him trying to get a supervisor,

7  told him that he needed a warrant, he could not search

8  the vehicle without a supervisor present.

9     Q.  You said you were yelling.  You raised your

10 voice?

11    A.  I was -- anybody that touches you and does

12 things like that -- and there is a whole lot more that

13 I can't say right now on what went on.  There was

14 reasons why I was raising my voice and questioning what

15 was going on.

16    Q.  Were you angry?

17    A.  Sure.

18    Q.  When you said that he picked you up off the

19 ground and threw you against the side of the Yukon, do

20 you mean you flew through the air that six to eight

21 inches?

22    A.  He picked me up off the ground one to two

23 inches and threw me into the vehicle.

24    Q.  So your feet were not touching the ground when

25 you hit the Yukon?

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

ROBERT BOULE - CONFIDENTIAL/AEO; March 09, 2018                               137

1        A.   That's correct.

2        Q.   But you hit the Yukon, he had let go of you,

3   and so you came down and landed on your feet at that

4   time?

5        A.   At that time.

6        Q.   And you yelled at Agent Egbert?

7        A.   Yes.

8        Q.   And you can't tell me what you yelled at him

9   right now, right?  We'll do that next time when we have

10   ICE's permission.

11        A.   That's fine.

12        Q.   I'm just making sure that is right.

13        A.   Yes.

14        Q.   Did you say Agent Egbert grabbed you and

15   lifted you off the ground again?

16        A.   No.  He threw me to the right, to the ground.

17        Q.   To your right or his right?  Because you're

18   facing each other, correct?

19        A.   As you're looking at the vehicle from the

20   passenger door to the passenger front fender.  He threw

21   me to the ground.

22        Q.   So you're on the passenger side of the car?

23        A.   Yes.

24        Q.   And he threw you towards the front of the car,

25   the front bumper?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

ROBERT BOULE - CONFIDENTIAL/AEO; March 09, 2018                    138

1        A.  Yes.

2        Q.  So your left --

3        A.  Yes.

4        Q.  And his right?

5        A.  Yes.

6        Q.  Where did he grab you when he threw you to

7   your left?

8        A.  The same location on my shoulder --

9        Q.  Chest again?

10       A.  Chest again.

11       Q.  Did he lift you up off the ground that time or

12  just to the side?

13       A.  I don't think he did.  He threw me to the

14  ground.

15       Q.  Did you have the impression that he was trying

16  to knock you to the ground or move you to the side?

17       A.  I have no idea what was going on in his mind.

18  I knew that he was out of line.  He had asked earlier

19  in the day about my health.  He knew that I had had

20  surgery, and all of a sudden he went rogue and was all

21  over me.  And no one should have the right to do that.

22  Period.

23       Q.  What was the surface like where you were

24  parked?

25       A.  Concrete.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1       Q.   So you fell down on the concrete?

2       A.   I fell to the concrete.

3       Q.   What part of your body contacted the concrete?

4       A.   The hip hit the concrete first, then my

5    shoulders and then my head.

6       Q.   Left side of your body?   Left hip?

7       A.   It would be the left, yes.

8       Q.   Do you think you recall hitting your head on

9    the concrete?   Is that what you said?

10      A.   When I got up, my head was on the ground.

11      Q.   When Agent Egbert threw you to your left --

12   I'm sorry, shoved you to your left?   What did you say?

13      A.   He threw us to the ground.

14      Q.   Your left hip contacted the concrete first?

15      A.   Yes.

16      Q.   Then did you say your left shoulder?

17      A.   The left shoulder.

18      Q.   And at some point you ended up laying on the

19   ground, including your head was now touching the

20   ground?

21      A.   Right.

22      Q.   Did you strike your head against the ground?

23      A.   I don't know if I struck my head or if we were

24   just on the ground, and then, you know, adrenaline

25   kicked in again, and then we got up.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1       Q.  But it was definitely the left side of your

2  body that contacted the ground?

3       A.  Yeah.

4       Q.  Did you -- you were wearing a hat and glasses,

5  right?

6       A.  That's correct.

7       Q.  Did your hat or glasses come off?

8       A.  I don't know if the hat came off.  I don't

9  think the glasses did.

10       Q.  And you don't recall having to pick your hat

11  up off the ground, do you?

12       A.  No, but there was so much going on at that

13  particular time, whether I remembered or didn't

14  remember picking up my hat is a moot point.

15       Q.  Did you immediately get up from the ground --

16       A.  Yes.

17       Q.  -- after you were knocked down?

18       A.  Yes.

19       Q.  What happened then?

20       A.  Adrenaline kicked in.  We called 911 again,

21  trying to get a supervisor.

22       Q.  What was Agent Egbert doing when you dialed

23  911 the second time?

24       A.  He was trying to get in to talk to the

25  gentleman.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  and blocking our driveway.

 2  　　Q.  I'm talking about on March 20, 2014, did he --

 3  　　A.  Not on that day, no.

 4  　　Q.  We're talking over each other which makes it

 5  hard for the court reporter.  So I'm sorry about that,

 6  I'll slow down.

 7  　　　　On March 20th, 2014, did Agent Egbert ever

 8  block you in your driveway?

 9  　　A.  No.  But he was in our driveway.

10  　　Q.  I understand, yeah.

11  　　A.  It's one of those things that we have never

12  had a Border Patrol agent in 17 years, when we asked

13  for a supervisor, not had the agent go back to his car

14  and call for a supervisor.  At no point was anybody

15  going anywhere.

16  　　　　And so the common practice of Border Patrol

17  agents is not to be on their own, but if we question

18  what is going on, a supervisor is brought to the

19  property for not only his safety but the safety of

20  people around him.

21  　　　　(Exhibit No. 8 marked for

22  identification.)

23  BY MR. GRINDELAND:

24  　　Q.  Handing you what has been marked as Exhibit 8

25  to your deposition, and feel free to page through it.



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

ROBERT BOULE - CONFIDENTIAL/AEO; March 09, 2018                    159

```
 1                 CORRECTION & SIGNATURE PAGE

 2   RE:   Bob Boule vs. Erik Egbert
           U.S. District Court, Western District at Seattle;
 3         2:17-cv-00106-RSM
            ROBERT JOSEPH JOHN BOULE; TAKEN MARCH 9, 2018
 4         REPORTED BY:  JUDY BONICELLI, CCR, RPR

 5         I, Robert Joseph John Boule, have read the within
     transcript taken March 9, 2018, and the same is true
 6   and accurate except for any changes and/or corrections,
     if any, as follows:
 7
         PAGE/LINE            CORRECTION            REASON
 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22         Signed at _____, Washington,

23   on this date:  _____.

24                  _____

25                  ROBERT   JOSEPH JOHN BOULE
```



206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                    REPORTER'S CERTIFICATE

 2

 3         I, JUDY BONICELLI, CCR No. 2322, Certified

 4    Shorthand Reporter, pursuant to RCW 5.28.010 certify:

 5         That the foregoing proceedings were taken before

 6    me at the time and place therein set forth, at which

 7    time the witness was put under oath by me;

 8         That the testimony of the witness, the questions

 9    propounded, and all objections and statements made at

10    the time of the examination were recorded

11    stenographically by me and were thereafter transcribed;

12         That the witness wishes to read and sign;

13         That the foregoing is a true and correct

14    transcript of my shorthand notes so taken.

15         I further certify that I am not a relative or

16    employee of any attorney or of any of the parties, nor

17    financially interested in the action.

18         I declare under the penalty of perjury under the

19    laws of the State of Washington that the foregoing is

20    true and correct.

21         WITNESS MY HAND and DIGITAL SIGNATURE this 17th

22    day of March, 2018.
                          Judy Bonicelli
23

24         JUDY BONICELLI, RPR, CCR
           Washington Certified Court Reporter, CCR 2322
25
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1              UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE
 2  _____

 3  ROBERT BOULE,                    )
                                     )
 4          Plaintiff,               )
                                     )
 5          vs.                      ) No. 2:17-cv-00106-RSM
                                     )
 6  ERIK EGBERT and JANE DOE         )
    EGBERT and their marital         )
 7  community,                       )
                                     )
 8          Defendants.              )

 9  _____

10  ERIK EGBERT,                     )
                                     )
11          Counterclaimant,         )
                                     )
12          vs.                      )
                                     )
13  ROBERT BOULE,                    )
                                     )
14          Counterdefendant.        )
    _____

15

16          DEPOSITION UPON ORAL EXAMINATION OF

17                    ROBERT BOULE

18                       VOLUME 2

19      (CONTAINS CONFIDENTIAL TESTIMONY SUBJECT TO
        PROTECTIVE ORDER AND FOR ATTORNEYS' EYES ONLY)
20  _____

21                    10:40 A.M.

22                  MAY 31, 2018

23          1305 11TH STREET, SUITE 301

24             BELLINGHAM, WASHINGTON

25  REPORTED BY: LESLIE POST, CCR No. 2378
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Exhibit A

ROBERT BOULE, VOL. 2 (CONFIDENTIAL); May 31, 2018                168

```
1         A.    No.  It was Canadian Customs.

2         Q.    Did the arrest occur at the point of entry?

3         A.    Yes.

4              MR. BOOS:  As a point of clarification,

5    Geoff, I believe the initials that Bob can't remember

6    are CBSA, Canadian Border Services Agency, or

7    something like that.

8              MR. GRINDELAND:  Thank you.

9         Q.    (By Mr. Grindeland)  Have you been formally

10   charged up in Canada?

11        A.    I have been charged with crimes for

12   allegedly organizing entry of nine refugee claimants

13   into Canada.

14        Q.    Is that the title of the charge, or is it

15   human trafficking?

16        A.    I have been charged with a crime or crimes

17   for allegedly organizing the entry of nine refugee

18   claimants into Canada.

19        Q.    What are you reading from right now?

20        A.    What's that?

21        Q.    You're reading that answer off a piece of

22   paper.

23              What are you reading?

24        A.    My personal notes.

25        Q.    They're notes that you made for yourself?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1          A.     It's a combination, yes.

2          Q.     Can I see that, please?

3                 Whose handwriting is on --

4          A.     That's mine.

5          Q.     Is this your handwriting up here, "Kristin

6     Johnson"?

7          A.     Yes.

8          Q.     Did you meet with Ms. Johnston before the

9     deposition today?

10         A.     I did.

11         Q.     For how long?

12         A.     Probably ten minutes.

13         Q.     Did you discuss these Canadian charges with

14    her?

15         A.     Not in detail, no.

16         Q.     Did Ms. Johnson give you some suggestions

17    about how to answer my questions about the charges?

18         A.     No.

19         Q.     What did you talk with Ms. Johnson about for

20    ten minutes this morning?

21                MR. BOOS:   Objection, that's attorney-client

22    privilege, I believe.

23         Q.    (By Mr. Grindeland)  Does Assistant

24    U.S. Attorney Kristin Johnson represent you,

25    Mr. Boule?



206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1    any of the evidence against you?

 2        A.    Not at this time, not evidence.

 3        Q.    Did you tell me that these charges relate to

 4    nine individuals?  Is that what you said?

 5        A.    Yes.

 6        Q.    And those are nine individuals who allegedly

 7    crossed the border from the United States into Canada?

 8        A.    They are nine refugee claimants into Canada.

 9        Q.    Do you know who those individuals are?

10        A.    I do not.

11        Q.    You don't know their names?

12        A.    I do not recall.

13        Q.    What time period are you accused of having

14    helped these people enter Canada?

15        A.    I do not recall.

16        Q.    Did it allegedly occur within the past year?

17        A.    I don't recall the time period.

18        Q.    You don't recall the events or you don't

19    recall what you've been told about the charges against

20    you?

21        A.    Both.

22        Q.    Have you helped people enter Canada outside

23    of official ports of entry?

24        A.    Based on advice of counsel, I'm exercising

25    my right under the Fifth Amendment not to answer that
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    question.

2         Q.    Have you been paid by people who you know

3    were trying to enter Canada outside of an official

4    point of entry?

5         A.    Based on the advice of counsel, I'm

6    exercising my right under the Fifth Amendment not to

7    answer that question.

8         Q.    Have you assisted anyone traveling the other

9    direction, coming from Canada into the United States,

10   outside of an official point of entry?

11        A.    No.

12        Q.    Have you ever had someone cross the border

13   at your property from Canada into the United States

14   and then given them a ride somewhere?

15        A.    We have had guests that got rides in our

16   vehicle that were stopped by Border Patrol and the

17   people were arrested, yes.

18        Q.    You've actually had people who have walked

19   across the border onto your property and then you have

20   given them a ride in your vehicle off your property,

21   correct?

22        A.    Yes.

23        Q.    You were paid for that?

24        A.    They paid for the night stay and the shuttle

25   service to the airport, yes.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1      Q.     Sometimes you would charge them for a night

 2 stay even if they didn't stay the night, correct?

 3      A.     That -- there's clarification on that.  To

 4 be in our vehicle as a shuttle, they have to be guests

 5 of the Smuggler's Inn, otherwise I can't take them

 6 anywhere.  So the answer is yes.  Everyone that rides

 7 in our shuttle is a guest of the Smuggler's Inn.

 8      Q.     So for instance, there have been individuals

 9 who have crossed the border illegally from Canada into

10 the United States to your property and then you

11 charged them for a night stay and gave them a ride

12 somewhere, even though they might have only been on

13 your property for a couple of hours at most?

14      A.     Restate the question.

15      Q.     You have had individuals cross the border

16 illegally from Canada to the United States to your

17 property, right?

18      A.     Yes.

19      Q.     You already told me some of those people you

20 have given rides further south to the airport or other

21 locations, right?

22      A.     Yes.

23      Q.     When you do that, you charge those

24 individuals both for a night stay at the Inn and for

25 the price of the ride, correct?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1        A.     Yes.

2        Q.     You charge them for a night stay even if

3    they're only on your property for an hour or two?

4        A.      This is anyone that signs our register has

5    to have a room before they go in our vehicles.

6        Q.     So you charge them for that?

7        A.     Of course.

8        Q.      Even if they're only on your property for an

9    hour?

10       A.      It doesn't matter the amount of time.  If

11   somebody gets a room, they have it for a 24-hour

12   period of time.  How long they stay in it is their

13   business, not mine.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com



25        Q.    Did you refund the money that you've charged

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    the border crosser?

2        A.    We do not.  Once they have had a room, it

3    still has to be cleaned.  We don't know if the people

4    aren't coming back to use that room.  Once they have a

5    room that is registered, we have to hold it for or

6    have a room available for them.

7        Q.    What about for the ride itself?

8        A.    What's that?

9        Q.    Do you refund the charge for the

10   transportation?

11       A.    We don't refund anything if someone has been

12   arrested.

13       Q.    So you charge hundreds of dollars for

14   transportation, right?

15       A.    We charge rates on the limousine, on

16   vehicles at $100 an hour, yes.

17       Q.    You sometimes charge more than $100 an hour?

18       A.    Sometimes it's $150.

19       Q.    Does it depend on how many people you're

20   giving a ride to?

21       A.    Or where you're going.  Sometimes it's

22   considerably less.  It just depends on the activity of

23   the vehicles.

24       Q.    So you know where the Greyhound Station is

25   in Bellingham?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1       A.    Yes.

 2       Q.    That's a place you sometimes transport these

 3  border crossers to, correct, or at least that's where

 4  you tell them you're taking them, right?

 5       A.    Go ahead and restate the question.

 6       Q.    Sometimes you charge people who have

 7  illegally crossed the border coming south for a ride

 8  to the Greyhound Bus Station in Bellingham, right?

 9       A.    Yes.

10       Q.    And every time you do that, ████████████

   ██████████████████████████████████████████

   ████████████████████████████████████████████████

   ████████████████████████████████

   █████████████████████████████████

15       Q.    How much do you charge someone when you tell

16  them you're taking them to the Greyhound Bus Station

17  in Bellingham?

18       A.    Eighty to $100.

19       Q.    Sometimes more?

20       A.    Probably not very often.

21       Q.    How much --

22       A.    Sometimes it's just the price of the room.

23       Q.    Then ██████████████████████████████

24  the border crosser gets apprehended within a few

25  blocks of the Smuggler's Inn?
```



206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

ROBERT BOULE, VOL. 2 (CONFIDENTIAL); May 31, 2018                              178

1        A.    That's correct.

2        Q.    And nevertheless you keep the money you

3    charge them for a ride?

4        A.    We have been told not to give money back.

5        Q.    Who told you that?

6        A.    We are a business.  Any time somebody is at

7    the business and asks for services, that is what they

8    are paying for, nothing more.  If -- we still have

9    to -- if you go to a motel and you pay and you decide

10   you don't want to stay, you are still charged for that

11   room.  If you make a reservation for Semiahmoo and do

12   not show up, they take a 50 percent deposit and they

13   charge your credit card.  We do nothing any different

14   than normal policies of any hotel/motel.

15       Q.    Has any federal agent told you that's okay

16   what you're doing; "Go ahead and do that, keep the

17   money you charged"?

18       A.    It's -- we have been -- it's not keeping the

19   money that we've charged.  It's the rulings that the

20   money is ours for the evening stay.

21       Q.    Let me ask it this way, Mr. Boule; have any

22   Border Patrol agents ever asked you to refund the

23   money to the person who's being arrested?

24       A.    They have.

25       Q.    And has any agent told you, "Don't listen to

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1    them, you don't need to do that"?

2        A.    Yes.

3        Q.    Who?

4        A.    I'm -- there has been several, and I do not

5    recollect exactly which ones have stated it.  But it

6    has been the policy for 15 years ███████████████

     █████████████     that they review the rules and our policies

8    and either accept them or don't.  If they don't, we

9    change them.  There have -- you know, it's just one of

10   those situations that you're asking questions, you

11   know, why would Border Patrol ask to refund the money,

12   it's none of their business.  You know, the

13   business -- they are guests.

14       Q.    Is Agent ████████████ one of the agents who

15   told you it's okay for you to keep the money you

16   charge?

17            ████████████████████████████████████████

     ███████████████████████████████████████████████████

     ████████████████

20       Q.    Including keeping money you've charged

21   aliens who get arrested?

22       A.    That is -- he's aware that it's going on,

23   but he's also aware that it is the same policy as

24   Semiahmoo, it's the same policy at the Northwoods,

25   it's the same policy at the Hilton or the Marriott.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1          You're trying to create something that isn't
2     there.
3          Q.   So last time we got together for your
4     deposition, there were some things that you declined
5     to answer until you got approval from ICE.
6               Do you remember that?
7          A.   I do.
8          Q.   And one of the things was the reason you
9     didn't want Border Patrol on your property back on
10    March 20th, 2014, the day of the incident with
11    Agent Egbert.
12         A.   That's correct.
13         Q.   So you told me before that you did not want
14    Border Patrol on your property, correct?
15         A.   That's correct.
16         Q.   Why is that?
17         A.   ████████████████████████
██████████████████████████ There have been times
19    that Border Patrol agents have not been extremely
20    clean as an agency.  There are times that there is
21    drug crossings, there is drug activity, there is
22    arrest activity at the Smuggler's Inn.  What they were
23    doing was encouraging drug situations and getting
24    information for any drug activity or talk of activity
25    on the property.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  staying at your Inn, most of them are headed across

2  the border, walking across the border from your

3  property?

4      A.   That's totally different than the question

5  you asked earlier.

6           Some of them are.

7      Q.   In fact, the majority of the foreign

8  nationals, the aliens who come and check in at your

9  property are attempting to cross the border illegally,

10 correct?

11     A.   I do not -- you know, based on the advice of

12 counsel, I'm exercising my right under the

13 Fifth Amendment not to answer that question.

14     Q.   So for many of your guests who do cross the

15 border, ICE has no idea who they are until after

16 they're long gone, right?

17     A.   I think you're incorrect on that.

18     Q.   ████████████████████████████████

   ████████████████████

20     A.   I think I've already explained that to you.

21     Q.   The checking in at the airport for a flight,

22 is that --

23     A.   They have the -- they have all the

24 information prior to and any information they want

25 they have.  We have -- they are legal in the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
1    United States.  And you're assuming that everybody is
2    crossing.  I have no idea if they truly are or not.  I
3    supply a bed for them.  I supply breakfast for them.
4    I treat all my guests as individuals.
5        Q.    And you're declining to answer my question
6    about the portion of those guests who are heading
7    north?
8        A.    I am.  Based on the advice of counsel, I'm
9    exercising my right under the Fifth Amendment not to
10   answer that question.
11       Q.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com



1      Q.     Okay.  But lots of other times you have a

2  guest from a country like Afghanistan at

3  Smuggler's Inn, right?

4      A.     That's correct.

5      Q.     After you check them in and copy their

6  passport,

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

██████████████████████████████████████

████████████████████████████

██████████████████████████████████

██████████████████████████

████████████████████

6      Q.     And sometimes that person then crosses the

7   border, right?

8      A.     Based on the advice of counsel, I'm

9   exercising my right of the Fifth Amendment not to

10  answer that question.

11     Q.     Okay.  Hypothetically, if a person like that

12  crossed the border headed north, they then went north

13  before ████████████████████████████████

14     A.     Based on advice of counsel, I'm exercising

15  my right under the Fifth Amendment not to answer that

16  question.

17     Q.     So there may be individuals, even dangerous

18  people on a terrorist watch list, who are headed north

19  across the border from your property because nobody is

20  checking their identity, right?

21     A.     Based on advice of counsel, I'm exercising

22  my right of the Fifth Amendment not to answer that

23  question.

24     Q.     Last time we talked you told me about

25  damages claims, property damage claims, two of them

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    Q.    You don't remember the specific

2    conversations you had with Agent Egbert either of

3    those first two times you encountered him on

4    March 20th?

5    A.    He looked in the limo, opened the door and

6    looked in the limo.  Whether he got in or just looked

7    in, I don't remember.  But he was looking at the

8    vehicle.

9    Q.    But you don't remember one way or the other

10   if you told him that you had a guest coming from

11   Turkey?

12   A.    I don't recall that.  I may have.  But I

13   don't know for sure that I told him that.

14   Q.    Okay.

15   A.    Any time when you tell an agent that you're

16   picking somebody up at the airport, they know that

17   they've already cleared security before they're coming

18   in.  So they have a passport and a visa, we know that

19   before they get in the car.

20   Q.    Even after the second conversation with

21   Agent Egbert, you did not contact Border Patrol,

22   right?

23   A.    No, no.

24   Q.    Just Agent ███████?

25   A.    ██████████████████████████


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1        A.    No.  He came over by that time and talked.

2        Q.    So you tried calling 9-1-1.  You got

3   somebody in Canada.  He explained you needed to hang

4   up, try dialing again or dial direct to Customs and

5   Border Protection, right?

6        A.    That's correct.

7        Q.    Then you hung up and then began conversing

8   with Agent Egbert?

9        A.    That's correct.

10       Q.    So you never talked to the dispatcher, the

11  American dispatcher, until after the incident with

12  Agent Egbert had already occurred, correct?

13       A.    That is correct.

14       Q.    I think one of the things you told me last

15  time we met, you told me you couldn't talk about it

16  that time, was what you said to Agent Egbert.

17       A.    Yes.

18       Q.    So now you're authorized?

19       A.    That's correct.

20       Q.    So what did you say to Agent Egbert?

21       A.    He said that he wanted to search the vehicle

22  and he wanted to talk to our guest.  I told him -- I

23  stood in front of the door and I told him that he

24  needed to call a supervisor and I would allow him to

25  search the vehicle at that time.  We also -- you know,

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    whether it was a supervisor or what.  But I told him

2    that until the supervisor got there, he would have to

3    have a warrant to search the vehicle.

4        Q.    This is not the first time that you have

5    told a Border Patrol agent "You don't search my

6    vehicle until you get a supervisor out here," right?

7        A.    That's correct.

8        Q.    You've done that before?

9        A.    I've done that before.  That was the first

10   time that I had asked for a warrant, because ▇▇▇ had

11   told me to ask for a warrant.

12       Q.    Was Agent ▇▇▇▇▇▇ trying to protect

13   Mr. Fikert?

14       A.    No.  He was trying to protect me from having

15   agents being alone on our property after they've been

16   told not to be on the property.  He felt that

17   something was out of the ordinary, there was a reason

18   why an officer would be not obeying Chief Luna's

19   directive not to be on the property.

20       Q.    So you still had not collected any money

21   from Mr. Fikert at this point, is that right?

22       A.    That's correct.

23       Q.    He had not paid for his ride from Sea-Tac?

24       A.    That's correct.

25       Q.    He had not yet paid you for his stay at the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    Inn?

2        A.    That's correct.

3        Q.    Is part of the reason you didn't want

4    Agent Egbert talking to Mr. Fikert because of that,

5    you were afraid he was going to get arrested before he

6    paid you?

7        A.    No.  I did not want any agent to be alone

8    and searching our vehicles, especially for the third

9    time in a day.  It was so out of character from what

10   they were supposed to be doing, that we just felt that

11   there was something wrong.

12       Q.    The last time we met you admitted that you

13   began yelling at Agent Egbert, right?  You raised your

14   voice and were yelling at him?

15       A.    That was after he picked me up and threw me

16   against the vehicle.

17       Q.    Okay.  And then you said that there's a

18   whole lot more you can't say right now about what went

19   on, that there were reasons you were raising your

20   voice.

21       A.    That's correct.

22       Q.    But you couldn't tell me then.

23             So what are those reasons?

24       A.    The reason that I couldn't tell you was that

25   ████████████████████████████████, they have

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  and call for a supervisor.  He took action, then, into

2  his own hands.  There was not a second officer there.

3  There was officers up the street that could have been

4  there.  The Yukon was blocked in.  It wasn't going

5  anywhere.  The guest wasn't going anywhere.  There

6  wasn't any reason for him to touch me or to throw me

7  to the ground, none at all.

8      Q.    But it was crystal clear to you that he

9  would have preferred you step aside and let him

10  contact --

11     A.    I don't think it was --

12     Q.    -- the guest?

13     A.    -- crystal clear on anything.  The whole

14  thing was fuzzy on why he was there.  He could not

15  explain why he was there.  He did not explain why he

16  was there.

17     Q.    You've already testified very clearly,

18  Mr. Boule, that you understood Agent Egbert wanted to

19  contact the guest in the back of the Yukon, right?

20     A.    That's correct.

21     Q.    And you stepped in front of the passenger

22  door to prevent him from doing that, right?

23     A.    Yes.

24     Q.    It was clear to you at that point you

25  weren't being detained, right?  You were free to walk

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

ROBERT BOULE, VOL. 2 (CONFIDENTIAL); May 31, 2018                    224

1    away from the Yukon, and in fact, Agent Egbert would

2    have preferred that you do that, walk away and leave

3    him alone, correct?

4         A.    That's correct.  But again, it goes right

5    back to what was he doing there.  And when he talks

6    about searching a vehicle for the third time without

7    someone there, I had no idea what or why he was going

8    to do what he did.

9         Q.    You had no idea why a Border Patrol agent

10   might be trying to do his job, is that what you're

11   telling me?

12        A.    No.  You're saying something that isn't --

13   in fact, we had been told that that particular Border

14   Patrol agent, none of them were to be on the property

15   without a call.  I asked if a call had been made, if

16   he was responding to a call.  And he was not.  And so

17   anything beyond that, he was doing something that was

18   different than the protocol that was set up by his

19   superiors and ICE.

20        Q.    Your understanding of the protocol?

21        A.    That's correct.

22        Q.    How many guns do you own?

23        A.    At this time, I have no idea.

24        Q.    Approximately how many guns do you own?

25        A.    More than three and less than ten.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1                    for identification.)

2         Q.   (By Mr. Grindeland)  So do you recognize

3    Exhibit 12 to be a printout of ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉

16         Q.   Do you see in Exhibit 12 where you tallied

17    up the number of guests staying at the Inn during a

18    three-month period?

19         A.   That's correct.

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

23         Q.   And you tallied up over a three-month period

24    you had 163 guests, correct?

25         A.   That's correct.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    Q.    And 47 of them were from Afghanistan?

2    A.    Uh-huh.

3    Q.    Yes?

4    A.    Yes.

5    Q.    Thirty-one from Pakistan?

6    A.    Yes.

7    Q.    Thirteen from Yemen?

8    A.    Yes.

9    Q.    You had ten from the United States, right?

10   A.    Yes.

11   Q.    And how many of these 163 guests over that

12   three-month period crossed the border north into

13   Canada?

14   A.    Based on the advice of counsel, I'm

15   exercising my right under the Fifth Amendment not to

16   answer that question.

17           (Deposition Exhibit No. 13 was marked

18              for identification.)

19   Q.  (By Mr. Grindeland)  Do you recognize

20   Exhibit 13 to be another series of ███████████

████████████████████████████████████████████████

███████████████████████

███████████████████████

24   Q.    And I should have asked you this about

25   Exhibit 12; that three-month period, what three-month



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
1          Q.     ICE produced it to you, gave you a copy of

2    it?

3          A.     That's correct.

4          Q.     Do you still have a copy of that?

5          A.     I have no idea.

6          Q.     When did you see that?

7          A.     Within the last week.

8          Q.     It looked different than this one?

9          A.     It looked different than this one.
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1



t

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1 ████████████████████████████████████

████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

███████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

███████████████████

13            MR. GRINDELAND:  We're over another hour

14    here.  Let's take another short break.  We're close to

15    done.

16                    (Recess.)

17                    (Deposition Exhibit No. 18 was marked

18                    for identification.)

19        Q.   (By Mr. Grindeland)  I've handed you what's

20    been marked as Exhibit 18 to your deposition.

21                    Is that an email you've seen before?

22        A.    I have not.

23        Q.    It's an email that was produced by

24    Customs and Border Protection, an internal email.  It

25    doesn't look like you were an addressee on it.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                  You've had a chance to review it, right?

 2       A.    I have.

 3       Q.    Do you know what incident that email is

 4  talking about?  Do you remember that incident?

 5       A.    I do not.

 6       Q.    You don't remember back in November 2009

 7  calling the Border Patrol to complain about an agent

 8  contacting one of your employees on your property?

 9       A.    I don't recall it.

10       Q.    But that's something that's occurred from

11  time to time over the years, right?

12       A.    That's correct.

13       Q.    After the incident with Agent Egbert back on

14  March 20, 2014, did you intentionally shine your

15  high-beams on a Border Patrol vehicle that was parked

16  at the end of your driveway?

17       A.    He was parked in my driveway, and yes.

18       Q.    That wasn't Agent Egbert, right?

19       A.    I have no idea.  We had the highs on and we

20  couldn't see who the agent was.

21       Q.    Well, did an Agent Jesse MacArthur get out

22  of the vehicle and chat with you?

23       A.    I do not recall.

24       Q.    Do you remember if the agent got out of the

25  car and talked to you?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1          A.     I do not recall.

2          Q.     You shined your high-beams on his vehicle

3     because you were annoyed that he was on your property,

4     right?

5          A.     Well, he was blocking the driveway.

6          Q.     Okay.

7          A.     People couldn't get in, they couldn't leave.

8          Q.     Did you also around that time, the week

9     after the incident with Agent Egbert, take photographs

10    of agents who were on or near your property?

11         A.     Chief Luna asked me to take a picture,

12    pictures of the agents if they were parking on our

13    property.  Yes.

14         Q.     And you did that, you took some pictures?

15         A.     Yes.

16         Q.     Do you still have those photos?

17         A.     I do not, no.

18         Q.     Where are they?

19         A.     They were in my phone.

20         Q.     And they're just gone now?

21         A.     That's correct.

22         Q.     So there's no way to recover them that you

23    know of?  There's no copies?  You didn't give copies

24    to your attorney or to Chief Luna or something?

25         A.     No.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    Q.      To ███████████ maybe?

2    A.      I don't think we gave them copies.   We

3  showed them to them.

4    Q.      To Chief Luna?

5    A.      And to ████████

6    Q.      Okay.

7    A.      And it was after that that they started

8  parking on West 99th, not on our turnaround or in our

9  driveway.

10              (Deposition Exhibit No. 19 was marked

11              for identification.)

12    Q.    (By Mr. Grindeland)   So Exhibit 19 is an

13  email that Customs and Border Protection produced that

14  discusses an incident back in 2012 where Border Patrol

15  apprehended three Guatemalans who'd crossed the

16  border.

17              Do you see that?

18    A.      Yes.

19    Q.      What I wanted to ask you about was the

20  second paragraph in Exhibit 19 where this Border

21  Patrol agent noted that you had charged this family of

22  three $200 for a room and $400 for a cab ride to the

23  bus station.

24              Do you see that?

25    A.      Yes.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.     Does that sound correct to you?

 2        A.     It does not.  But I don't recall the

 3   incident at all.

 4        Q.     Is it possible you charged this family of

 5   three that crossed the border $600 for a ride to the

 6   Greyhound Bus Station in Bellingham?

 7        A.     It is highly unlikely, but that doesn't mean

 8   that it might not have happened.

 9        Q.     The drive to the Greyhound Bus Station from

10   Smuggler's Inn would take about a half hour?

11        A.     No.  It's about 45 minutes, by the time you

12   drop them off, and it's another 45 minutes back.

13        Q.     But you called and alerted Border Patrol so

14   they could apprehend these folks within a few blocks

15   of your house?

16        A.     That's not correct.

17        Q.     What's not correct about it?

18        A.     I didn't call the Border Patrol.

19        Q.     So back in 2012 -- I'm sorry.
```

206 622 6875 | 800 831 6873
production@yomreporting.com
www.yomreporting.com

```
 1              CORRECTION & SIGNATURE PAGE
 2   RE: BOULE vs. EGBERT, ET AL.
 3       US DISTRICT COURT, WESTERN DISTRICT, AT SEATTLE;
 4       No. 2:17-cv-00106 RSM
 5       ROBERT BOULE; TAKEN MAY 31, 2018
 6            Reported by: LESLIE POST, CCR No. 2378
 7            I, ROBERT BOULE, have read the within
 8   transcript taken MAY 31, 2018, and the same is true
 9   and accurate except for any changes and/or
10   corrections, if any, as follows:
11   PAGE/LINE              CORRECTION              REASON
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21       Signed at _____, Washington,
22   on this date: _____
23
24            _____
25                 ROBERT BOULE
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                    REPORTER'S CERTIFICATE

 2          I, LESLIE POST, the undersigned Certified Court

 3   Reporter, pursuant to RCW 5.28.010, authorized to

 4   administer oaths and affirmations in and for the State

 5   of Washington, do hereby certify that the sworn

 6   testimony and/or proceedings, a transcript of which is

 7   attached, was given before me at the time and place

 8   stated therein; that any and/or all witness(es) were

 9   by me duly sworn to testify to the truth; that the

10   sworn testimony and/or proceedings were by me

11   stenographically recorded and transcribed under my

12   supervision, to the best of my ability; that the

13   foregoing transcript contains a full, true, and

14   accurate record of all the sworn testimony and/or

15   proceedings given and occurring at the time and place

16   stated in the transcript; that a review of which was

17   requested; that I am in no way related to any party to

18   the matter, nor to any counsel, nor do I have any

19   financial interest in the event of the cause.

20          WITNESS MY HAND AND SIGNATURE THIS 4TH DAY OF

21   JUNE 2018.

22

23   _____

24   LESLIE POST

25   Washington State Certified Court Reporter No. 2378
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

KENNETH ANDERSEN; June 01, 2018                                    1

```
 1              UNITED STATES DISTRICT COURT

 2    FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____

 4    ROBERT BOULE,                )
                                   )
 5            Plaintiff,           )
                                   )
 6            vs.                  )  No. 2:17-cv-00106-RSM
                                   )
 7    ERIK EGBERT and JANE DOE     )
      EGBERT and their marital     )
 8    community,                   )
                                   )
 9            Defendants.          )
                                   )
10    _____

11    ERIK EGBERT,                 )
                                   )
12            Counterclaimant,     )
                                   )
13            vs.                  )
                                   )
14    ROBERT BOULE,                )
                                   )
15            Counterdefendant.    )
      _____

16

17        VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

18                           OF

19                    KENNETH ANDERSEN

20    _____

21                      10:14 A.M.

22                     JUNE 1, 2018

23                  1431 SUNSET AVENUE

24                 FERNDALE, WASHINGTON

25    REPORTED BY: LESLIE POST, CCR No. 2378
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**Exhibit B**

1    2014, is -- was Smuggler's Inn part of the area that

2    the agents you were supervising were patrolling?

3        A.    Yes.

4        Q.    So Smuggler's Inn falls within the

5    jurisdiction, so to speak, of the Blaine Station?

6        A.    Absolutely.

7        Q.    Have you -- prior to the incident with

8    Agent Egbert and Mr. Boule, had you been on the

9    Smuggler's Inn property?

10       A.    Many times.

11       Q.    Can you estimate at all how many times you

12   had been on there?  Is it a matter of hundreds?

13       A.    Yeah, yes.  I was there daily.

14       Q.    Why were you there daily?

15       A.    It was part of -- it's right on the

16   international border.  There's a lot of alien traffic

17   back and forth in that area.

18       Q.    And when you say there's lots of alien

19   traffic back and forth in that area, could you explain

20   what you mean by that so the jury can have the context

21   of --

22       A.    Okay.

23       Q.    -- what happens at Smuggler's Inn?

24       A.    Yeah.  Aliens get dropped off by vehicles on

25   the Canadian side and run north -- or south, excuse

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    ███████████████████████████████████████.

2       Q.    So would -- is it accurate to say that the

3    Smuggler's Inn is one of the few locations where the

4    most crossings happen?

5       A.    Well, there's -- I would say there's more

6    than a few.  But it's one of the target areas that

7    we're always concerned about at the station.

8       Q.    You said you worked at the Blaine Station

9    for -- not 16 -- I guess the -- you worked in Arizona

10   for 16 years and then you spent the remainder of your

11   time in Blaine?

12      A.    Yes.

13      Q.    Did you live in the Blaine area --

14      A.    Well --

15      Q.    -- during that time?

16      A.    -- I live in Bellingham.

17      Q.    Do you know Mr. Boule?

18      A.    I know who he is.  I -- I'm not -- I've met

19   him.  I don't think I've ever formerly introduced

20   myself.  I might have.  But I know who he is.

21      Q.    Do you remember about when you became

22   familiar with who he was?

23      A.    Probably the first day I was at

24   Blaine Station.

25      Q.    And that was -- when did you start at the


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    Blaine Station?

2         A.    April 2008.

3         Q.    Why would you have become familiar with him

4    the first day on the job?

5         A.    His area was an irritant, the hotel itself

6    was a constant source of aggravation with the aliens

7    being hidden in there and running back and forth.

8    Just the activity in the area.

9         Q.    Did you use the word "irritant"?

10        A.    Yes, I did.

11        Q.    What did you mean by that?

12        A.    Well, because the aliens would go -- would

13   run -- either -- either he would pick them up from the

14   airport and drop them off and take them to his hotel,

15   they would stay in there.  So they're kind of hiding

16   in his -- in his hotel.  We weren't sure all the time

17   of their citizenship.  And without -- without enough

18   cause, you can't do a knock-and-talk and go in and

19   through the house and question everybody in there, you

20   know, due to the Fourth Amendment.

21              But then later on in the night sometime,

22   usually at midnight hours, late at night they would

23   run into Canada.  And the same the other way.  They

24   would get dropped off in Canada and run into his hotel

25   in the middle of the night, 2:00 in the morning.  He

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   lived there, too, so it was -- I mean, who leaves
 2   their back door open in the middle of the night?  You
 3   know, but aliens would run in there and a lot of times
 4   we would go in and find the aliens hiding in the
 5   house.  But it was just -- it's just a -- that's what
 6   I mean by "irritant."  It was a constant, you know,
 7   there's aliens in the hotel again, there's -- you
 8   know, we don't know their citizenship.  Then they go
 9   south or north that day.  It was a constant irritant.
10   It might have not -- not have been as aggravating to
11   some people as it was me, but it was aggravating to
12   me.
13        Q.   Was what was aggravating to you the fact
14   that there was such a high-traffic area or was there
15   something about Mr. Boule particularly?
16        A.   No.  It's just that it seemed like nothing
17   was ever done about it.  You know, there's lots of
18   cases like that where it seems like ███████████
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
12        Q.     What was Mr. Boule's involvement in the
13    alien trafficking at Smuggler's Inn?
14        A.     Well, I can't speak to it, I mean, exactly
15    what he was doing, because I wasn't a witness, I
16    wasn't participating.
17               But I mean, the aliens would come into his
18    Inn at night from Canada and hide in there and then --
19    then his shuttle would leave in the morning, sometime
20    during the day, and they'd be in the -- they'd be in
21    the shuttle going to the airport.  Or they would come
22    from the United States, either just arrive there by
23    car or he would pick them up from the airport, either
24    Seattle or Bellingham, and take them to the Inn.  And
25    these usually had visitors' visas.  So they entered
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    the United States legally, and we all believed and it

2    was proven that they entered the United States

3    through -- with visitors' visas to go into Canada to

4    claim asylum.

5            But anyway, he would house them there, and

6    we believed that he was -- you know, he'd get the

7    money for the aliens, for the hotel stays and the

8    rides and all that, and then I'm not sure if he was

9    being paid by smugglers or a combination of smugglers

10   and the aliens.  But he was -- he was making money

11   from that.

12           And then also this is true with other

13   smugglers, too, the aliens would come into the -- to

14   his hotel from Canada, he would be paid for rides to

15   the airport, ██████████████████████████████

     ██████████████████████████████ then we

16

17   would arrest them before they got a ride down to the

18   airport.

19           That's a common tactic with alien smugglers,

20   people that are harboring, they get the money from the

21   aliens and then they call Border Patrol to come arrest

22   them so they don't have to continue with their

23   furtherance.  That's what I think.  It's a common

24   belief, and I'm sure there's reports out there in

25   Blaine and other stations in the country that


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    substantiate this through witness interviews and

2    stuff.

3        Q.    About Mr. Boule?

4        A.    Yes.

5        Q.    So am I understanding correctly that you

6    suspected or the Border Patrol in general -- agents in

7    general suspected that he would be paid by aliens for

8    transportation to the airport, for example, ███████

███████████████████████████████████████████████████ ,

10   but he wouldn't -- he would keep the money --

11       A.    Yes.

12       Q.    -- that they paid him?

13       A.    Yes.

14       Q.    Even though he didn't render the services?

15       A.    Absolutely, yes.

16            MR. BOOS:  Objection to what is maybe more

17   of a rough restatement than what he said, but I won't

18   object to the content.

19       Q.   (By Ms. Carsley)  Is what I said an accurate

20   summary of what you told me?

21       A.    Yes.

22       Q.    In terms of Mr. Boule accepting money for

23   services that he didn't render, we talked about how

24   there were rides that he didn't give aliens because he

25   would report the aliens prior to completing a ride,


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    did Border Patrol and you suspect that this also

2    happened with money he would receive for rooms at his

3    hotel?

4         A.    Yes.

5         Q.    So he'd be paid for a night's stay at his

6    hotel, but the aliens who were staying at his hotel

7    wouldn't stay the night?

8         A.    Usually they left in the middle of the night

9    and ran into Canada.

10         Q.    And you said it's common for individual who

11    are smugglers or who are harboring aliens not to

12    refund funds for services that aren't rendered?

13         A.    Yes, that's common.  It's very common.

14         Q.    And you know that based on your years of

15    experience --

16         A.    Yes.

17         Q.    -- and training?

18         A.    Yeah.  I've interviewed aliens that have

19    told me they paid for rides and stuff like that and

20    there's nothing I could do about it.  I could try to

21    get the driver, the taxicab driver, the smuggler, to

22    give them their money back, but they're not going to

23    do that, you know.

24         Q.    Is that something that Border Patrol in

25    general tries to help aliens with is getting refunds?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

KENNETH ANDERSEN; June 01, 2018                                              24

```
 1        A.    It's -- you might ask, but it's not really a
 2   priority.  I mean, you've got other things to do.  The
 3   aliens made the choice to enter the country and deal
 4   with the smugglers, so you -- I guess you make your
 5   decisions and have to live with them.  But there are
 6   agents who try to get the money back.  But it's not
 7   something you would try to make a priority every time
 8   you caught a load of aliens.
 9        Q.    Because you have so many other competing
10   priorities?
11        A.    Yeah, there's lots of -- you've got to
12   process them, so it's not a priority.
13        Q.    So your understanding was that Mr. Boule
14   knew that the individuals who were booking rooms at
15   his Inn were booking rides with him intended to cross
16   the border illegally?
17        A.    I believe so, yes.
18        Q.    Let me back up for a second.
19              Is it legal to cross the border at the
20   Smuggler's Inn?
21        A.    No.
22        Q.    Where is it legal to cross the border in the
23   Blaine area?
24        A.    On foot at ports of entry, to be inspected.
25        Q.    So it's not -- it's not legal for anyone to
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1    cross at the Smuggler's Inn?

2        A.    No.

3        Q.    You said that you, while you were working as

4    a supervisory Border Patrol agent in Blaine, probably

5    had daily interactions with Mr. Boule.

6        A.    Not daily.  Once or twice a week, the

7    average, couple times a week probably.

8        Q.    Did most of those interactions happen at the

9    Smuggler's Inn?

10       A.    Yes.

11       Q.    And those interactions were related to

12   illegal border crossing or suspected illegal border

13   crossing?

14       A.    Yes.

15       Q.    Was Mr. Boule helpful to law enforcement

16   during those interactions?

17       A.    Sometimes he was and sometimes he wasn't.

18       Q.    Would you explain that a little more?

19       A.    It seems like if he was getting his way he

20   was cordial and would help us, but if he -- for

21   instance, he got mad at us on more than one occasion

22   and tried to demand that we not be on his property and

23   couldn't patrol the area because he'd be mad at us for

24   questioning aliens, stopping aliens before they got

25   into his hotel.  So it was -- it was playing both

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   sides.

2       Q.    Why would he be mad at a Border Patrol agent

3   for questioning an alien?

4       A.    Because we would stop the people that were

5   on his property if we believed -- if we had a

6   suspicion that they were illegally entering the

7   country and question them and try to document their

8   citizenship, and if we took them away before he got

9   reimbursed before any hotel bills or rides, he

10  wouldn't get paid.

11      Q.    But if, for example, he had already been

12  paid for services, maybe on those occasions he would

13  be more helpful to Border Patrol's enforcement

14  activities?

15      A.    Possibly.  I mean, I can't speak to a fact,

16  but that's what we believed, you know.  Most of the

17  ones we caught there were -- they had -- without his

18  interference or without -- without any question,

19  excuse me, without him having any input was the ones

20  that had -- were the ones that had immediately entered

21  that we had apprehended.  You know, otherwise they'd

22  been at his hotel for awhile or -- you know.  But if

23  they had just immediately entered, I mean, there was

24  no questions whether -- he had no input on whether

25  we'd take them or not and he probably didn't complain

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      A.    At times.  Mostly he was -- most of the time

2  he was fairly cordial, fairly.  He was nice.  And

3  there was lots of times we went into the hotel in the

4  middle of the night to find these aliens that had just

5  entered from Canada, and he did let us into the --

6  there's two building on the property.  One is the main

7  house and then there's a -- I think it's called a

8  carriage house.  It's like a big shop.  There's a

9  bunch of cots in there and people stay in there.

10         He let me in there and other agents in there

11  a few times.

                                                    So he

13  would let us in and then we would arrest these aliens

14  and take them back to the station.

15         So I don't know if he -- I mean, we believe

16  that he'd already been financially reimbursed for the

17  stays, paid by the smuggler or paid by somebody,

18  whoever, so he wasn't really resistant to us taking

19  the aliens.

20      Q.    I think you said earlier that you had the

21  impression that Boule was playing both sides?

22      A.    Uh-huh.

23      Q.    And what did you mean when you said that?

24      A.    Well, he was --

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com



1    ███████████████████████████████

███████████████████████████

████████████████████████████████

██████████████████████████████

███████████████████████████████ and

7    at the same time harboring illegal aliens and

8    furthering their entry into the United States and/or

9    Canada.

10      Q.    ████████████████████████████

████████████████████████

████████████████████████████████

██████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

█████████████████████████████

████████████████████████████████

███████████████████

██████████████

████████████████████████████████

████████████████████

███████████████

████████████████████████████

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    ████████████████████████████.  We would just hear,

2    Well, there's three aliens at the Inn, there's four

3    aliens at the Inn, there's, you know, Pakistanis or

4    Afghanis or Iranians or whatever they were.  ███████

5    ████████████████████████████████████████████████████.

6    That's all.

7         Q.    So if I'm understanding correctly, it sounds

8    like the hard part of this relationship was then left

9    to Border Patrol to --

10        A.    Oh, yeah, yeah.  Unless we said no.  I tried

11   to say no sometimes, but that doesn't go -- I mean,

12   I've got a boss, you know, that only goes so far, you

13   know.

14        Q.    And what would -- what would Mr. Boule do to

15   not be helpful for Border Patrol when Border Patrol

16   showed up to do the apprehensions?

17        A.    He would try to mainly run the aliens into

18   the hotel before we got there or just try to stop us

19   from questioning them.

20            I did a lot of vehicle stops where he would

21   not protest at all.  But we knew the alien was illegal

22   coming out of the hotel, and he would leave and not

23   want us to stop the -- not want us to apprehend the

24   alien at the hotel, ████████████████████████████████

     █████████████████████████████████████████████

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   ██████████████████████████████████████████████

    █████████████████████████████████████ do a vehicle

3   stop, grab the alien and take off without any question

4   at all.  Those are the instances we believe he's

5   already paid by the alien or smuggler or whoever, so

6   he didn't care.  He was supposed to take them to

7   Seattle or Bellingham, so he didn't have to drive

8   there and he still got his money.

9        Q.   Why do you think he wasn't helpful when

10  Border Patrol was trying to do the apprehensions at

11  the hotel?

12       A.   Because -- probably because he hadn't been

13  paid yet.

██████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   a room at a time?

2       A.    Uh-huh, yes.  And there's rooms upstairs,

3   too, but I've never been in them, so I don't know what

4   they're configured like.  Yeah.

5       Q.    But the cots in the carriage house, that

6   doesn't sound to me like a typical -- that -- what one

7   would picture as a bed and breakfast?

8       A.    It didn't seem like it was, no.  More like a

9   barracks room.

10      Q.    You also mentioned that Mr. Boule kept his

11  doors unlocked?

12      A.    Yes.

13      Q.    Why do you think he did that?

14      A.    I think because he was -- people -- so

15  people -- people could run into the hotel in the

16  middle of the night without being deterred.  That's

17  the only reason I can think of.

18      Q.    So you were involved in apprehensions of

19  aliens both at his property and that occurred on the

20  side of a road from when he was giving aliens a ride

21  to an airport?

22      A.    Yes.

23      Q.    Did you ever have any written communications

24  with Mr. Boule, emails or text messages?

25      A.    No.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    Q.    Just let us know.

2          So it sounds like after the incident

3    between --

4          MR. BOOS:  Objection, Counsel.  He didn't

5    say anything about the incident between Mr. Boule and

6    Mr. Egbert.  You can't put words in his mouth.

7    Q.    (By Ms. Carsley)  It sounds like after the --

8    if I'm understanding correctly, after the incident

9    between Mr. Boule and Agent Egbert, the relationship

10   between Border Patrol and Mr. Boule changed?

11   A.    Yes, that's what I said.

12   Q.    You said that Mr. Boule attempted to -- you

13   said words to the effect of that Mr. Boule attempted

14   to ban Border Patrol from his property?

15   A.    He did.

16   Q.    And what do you -- what do you mean by that?

17   A.    Well, he's not technically allowed to,

18   because anywhere within 25 miles of the border we

19   can -- we can be and patrol the border.  But as a

20   courtesy to prevent -- to deescalate the situation,  ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   Q.    Prior to what happened between Agent Egbert

24   and Mr. Boule, Border Patrol would sit on Mr. Boule's

25   property and monitor the border?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1        A.    At times, yes.

2        Q.    Did this, quote, unquote, ban from his

3    property, did that happen at any point prior to the

4    incident in your memory?

5        A.    No, I don't remember -- I don't think it

6    did.

7        Q.    And it was after the incident between

8    Mr. Boule and Agent Egbert that Mr. Boule started

9    filming Border Patrol activity?

10       A.    Yes, yes.

11       Q.    You said that mister -- you thought

12   Mr. Boule was aggravated with Border Patrol after the

13   incident?

14       A.    Yes, very aggravated.

15       Q.    Was there something specific that aggravated

16   him other than the incident?

17       A.    No.   I think it was just the incident.

██████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████

███████████████████████████████████

████████████████████ .

23       Q.    But would mister -- would Border Patrol --

24   were there instances when Border Patrol would still go

25   on his property after the incident?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1       A.    Absolutely.  If there was suspicion of

 2   illegal aliens or illegal activity, then we definitely

 3   were on his property.

 4       Q.    And Border Patrol is entitled to do that

 5   under the 25-Mile Rule?

 6       A.    Absolutely.

 7       Q.    Was there other illegal activity that

 8   happened around the Smuggler's Inn other than just

 9   alien smuggling?

10       A.    There was narcotics.  I was only involved in

11   one incident with narcotics and it was some opium-type

12   plant that Indians use.  I can't remember the name of

13   it right now.  I'd never heard of it before.  We

14   didn't know what to do with it when we caught it.

15       Q.    Was that Doda?

16       A.    Yeah, that's it, Doda.  You're good.  Yeah,

17   Doda.  Yeah.  That's the only narcotics that I

18   remember that I was involved in.

19       Q.    Was your understanding that there were also

20   drugs being smuggled across the border at

21   Smuggler's Inn even though you weren't involved?

22       A.    Yeah, there were narcotics being smuggled in

23   the area for sure.  I just was never involved in any

24   of them.

25       Q.    And when you say "in the area," you mean at

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1    But as time went on, it seemed like there was less and
 2    less of that, and then almost none of it.
 3        Q.    And when you say "almost none of it," what
 4    was -- what's that time period when it -- when it
 5    seemed that he had no legitimate guests?
 6        A.    Well, three, four years at least, where it
 7    seemed it was kind of empty, like there was nothing
 8    going on there except for the alien traffic back and
 9    forth across the international boundary.
10        Q.    And what time period was that?  Would that
11    have been in --
12        A.    Say, you know, 14 to 17, 13 to 17.  It was
13    quite awhile where it seemed like it was kind of
14    quiet.
15        Q.    It seemed like the only business there was
16    alien trafficking?
17        A.    Yes.
18        Q.    And you had that hunch from being on the
19    property regularly?
20        A.    Well, yeah.  I -- you could see plenty, if
21    people were there or not, and the parking lot is right
22    in front.  And I've been inside there a couple times
23    and it didn't seem like it would be a place where you
24    and I would visit.  It was -- it smelled like dogs and
25    it was just kind of not really clean and stuff.  But

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    anyway, that's just my opinion.  But yeah, I noticed,

2    you can tell when people are there.

3        Q.    You can tell when people are there because

4    there might be cars parked in the driveway?

5        A.    Yes.  And people -- and people -- he had a

6    gazebo in the middle where he would put out food and

7    they would sit, you know, have dinner, stuff like

8    that.  There would be people milling around when there

9    was a party there, a large group of people.  You can

10   tell if it was empty or not.

11       Q.    Did you see many big events happening at the

12   Smuggler's Inn?

13       A.    When I first got there, there was a handful.

14   Not a -- not a lot, but a handful of them.

15       Q.    And over time that stopped?

16       A.    Yes.

17       Q.    So around the 2017 -- or excuse me, 2014

18   time frame, you would say there were no longer any big

19   events?

20       A.    That's a guess, I would say.

21       Q.    I'd like to talk about what you know about

22   the sources of Mr. Boule's income.

23             We talked about one source of income being

24   smugglers paying him to traffic aliens across the

25   border.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1 ████████████████████

████████████████████████

████████████████████████

████████████████████████████

████████████████████████████

████████████████

7      Q.    Would Mr. Boule provide information or tips

8  to Border Patrol?

9      A.    I don't remember.  I don't believe so.  No,

10  I don't think so.

11          I know that the day that Egbert and him got

12  in their little argument, that he had told Egbert that

13  a person he was picking up from the airport either had

14  questionable immigration status or something.  That's

15  why Egbert was down there questioning the alien.  But

16  as far -- regularly, no, he didn't call us and give us

17  any information, I don't believe.

18      Q.    So did it seem unusual on the day of the

19  incident that Mr. Boule had passed along this tip to

20  Agent Egbert?

21      A.    Yes, yes.

22      Q.    And that would be a reason for Agent Egbert

23  to investigate the tip?

24      A.    Absolutely, yes.  If Boule told him that the

25  alien -- he believed the alien could have been illegal


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    and said, "Come on down and question him," then, yeah,

2    of course.   I mean, you're invited on the property.

3    Absolutely.

4         Q.    And you would have expected one of your

5    Border Patrol agents to do that?

6         A.    Yes.   Egbert and I talked beforehand, he

7    came down and talked to me and said, "Boule told me

8    there was a guy that he's picking up at the airport

9    that could possibly be illegal."   And he was very

10   cordial when he was talking to Egbert.

11             And then he said that Boule was going to

12   call him when he went there -- or Egbert was going to

13   go there and when Boule showed back up he was going to

14   question the alien, they already talked about it, him

15   and Boule.

16             I said all right.   So I was in the area

17   waiting and then -- then Egbert called me down there.

18        Q.    Let's go ahead and --

19             MS. CARSLEY:   Unless anyone wants a break,

20   I'm ready to move to talking about the incident.

21             MR. BOOS:   I could use a break.

22             MS. CARSLEY:   Okay.

23             THE VIDEOGRAPHER:   Going off the record now,

24   the time is 11:10.

25                  (Recess.)

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                    (Deposition Exhibit No. 3 was marked

 2                    for identification.)

 3               THE VIDEOGRAPHER:  We are back on the record

 4    at 10:23.

 5          Q.   (By Ms. Carsley)  Is it accurate to say that

 6    in your almost ten years of experience of dealing with

 7    Mr. Boule and your experience at the Blaine Station,

 8    that your opinion was that Mr. Boule actively assisted

 9    and facilitated alien smuggling at his property?

10          A.    Yes.

11          Q.    You understand that Mr. Boule has brought

12    this lawsuit against Agent Egbert for an encounter

13    that happened at Smuggler's Inn on March 20th of 2014?

14          A.    Yes.

15          Q.    You were present at Smuggler's Inn after the

16    encounter between those two individuals, correct?

17          A.    Correct.

18          Q.    Were you on duty that day?

19          A.    Yes.

20          Q.    Wearing your full uniform?

21          A.    Yes.

22          Q.    Agent Egbert was one of the agents you were

23    supervising?

24          A.    Yes.

25          Q.    What interactions did you have with
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Agent Egbert that day prior to what happened with

2      Mr. Boule?

3          A.    In the morning at muster and then when we

4      gave everybody their assignments and all that.  And

5      then when he had called me on the radio to meet with

6      him about a discussion he had with Mr. Boule about the

7      alien that he thought was illegal that he was going to

8      pick up from the airport.

9          Q.    So what was it that you recall Agent Egbert

10     described about the interaction he had with Mr. Boule?

11         A.    He said that he and Mr. Boule were talking

12     and Mr. Boule told him that there was an alien he was

13     going to pick up at the airport that was possibly

14     illegal for some reason, and that when the guy came

15     back -- when Mr. Boule came back with the alien, he

16     was going to -- it was okay if Egbert went down and

17     questioned him.  That's what Egbert told me.  I said

18     all right, and he took off and went to the area and

19     waited for him to show up at the hotel.

20         Q.    Did you have any concerns about

21     Agent Egbert's plan to go and question the alien once

22     he arrived at Smuggler's Inn?

23         A.    No.  Because Egbert told me that Mr. Boule

24     was cordial and they were talking.  And it was kind of

25     shocking really that he had been so forthright saying

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    this guy might be somebody you might want to look at,

2    he might be illegal.

3              I said, "Well, if he's go -- if he's down

4    for it, then go ahead, you know, no problem."

5        Q.    And you agree, though, that was appropriate

6    for mister -- or for Agent Egbert to do --

7        A.    Yes.

8        Q.    -- to go and talk to the alien?

9        A.    Absolutely.

10       Q.    And at this time Border Patrol hadn't been

11   asked to stay off of Mr. Boule's property?

12       A.    No.

13       Q.    Do you agree that Agent Egbert had a duty to

14   investigate the information that Mr. Boule provided?

15       A.    Yes, he did.

16       Q.    I -- the court reporter put in front of you

17   what's been marked as Exhibit 3 to your deposition.

18             Do you recognize this document?

19       A.    Yes, I do.

20       Q.    What is it?

21       A.    It's a memo that I wrote after the incident

22   between Mr. Boule and Agent Egbert, because he filed a

23   complaint -- or he complained.  He didn't -- he didn't

24   file a complaint, as far as I know, an actual citizen

25   complaint, but he complained to me about the -- about

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    not stop harassing him and his customers."

2         Did I read that correctly?

3    A.   Yes.

4    Q.   What did that mean to you when Mr. Boule

5    said he would stop cooperating with Border Patrol?

6    A.   He was probably referring to letting us on

7    his property, and we had ███████████████

      ████████████ and stuff like that, I guess meaning that

9    he wouldn't let us do that anymore.

10    Q.   But there wasn't any other kind of

11    cooperation he was providing, at least to

12    Border Patrol?

13    A.   No.

14    Q.   You also wrote, not the next sentence, but

15    the following one, "He stated that ███████████

      ██████████████████ and that he would not

17    allow Border Patrol agents, specifically Agent Egbert,

18    onto his property."

19    A.   Uh-huh.

20    Q.   Did I read that correctly?

21    A.   Yes.

22    Q.   So at this time, like you testified earlier,

23    agents were allowed to be on his property?

24    A.   We went on the property, absolutely.

25    Q.   When you arrived on the property, were you


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    hold on a second.

2            Yeah, he did say that -- that Egbert pushed

3    him.

4        Q.    Do you remember if he said anything else

5    about what allegedly occurred between him and

6    Agent Egbert?

7        A.    No.

8        Q.    What was his demeanor like?

9        A.    He was agitated.  He was -- he was breathing

10   hard.  He was -- he was upset, obviously upset.  And I

11   believed it was because he -- Egbert was there talking

12   to the alien and all of the sudden he had changed his

13   mind about Egbert questioning the alien and he was mad

14   that Egbert was there.

15           And then as soon as I told Eg -- as soon as

16   I talked to Mr. Boule and got everything done, he

17   immediately grabbed the alien and ran him into the

18   hotel.  So I believe even -- even more the reason that

19   he was upset because he hadn't gotten the alien into

20   the hotel yet and collected any funds from him.

21       Q.    Did you talk to Agent Egbert at

22   Smuggler's Inn?

23       A.    Briefly.  But I think I told -- I told him,

24   "Let's get out of here to clear the area so we can --

25   not get this thing -- any more agitation from

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   Mr. Boule or me or anybody else.  And let's clear the

 2   area and go back to the office and then we decide --

 3   we can talk about what happened and we can talk a

 4   minute."

 5      Q.    What was Agent Egbert's demeanor like at the

 6   Smuggler's Inn?

 7      A.    Calm, he was fine.

 8      Q.    So he wasn't upset or agitated or angry?

 9      A.    Not that I remember, no.

10      Q.    Did it appear like there had been an

11   altercation between Mr. Boule and Agent Egbert?

12      A.    I didn't see any evidence of any injuries on

13   Mr. Boule.  I didn't inspect his skin or anything.  I

14   just looked at his clothes.  I didn't see any dirt on

15   him or any evidence there had been a scuffle or

16   anything like that.  There was no sign to be cut

17   because it was -- there was no -- it was concrete, so

18   I couldn't tell if anybody had a fall and then made

19   any scuffs on the ground or anything.  It didn't

20   appear like -- he was just breathing hard and like he

21   was -- he was upset, that's about all I could get from

22   it.

23      Q.    But you didn't see any dirt or anything on

24   his clothes --

25      A.    No.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1       Q.    -- like he had been on the ground?

2       A.    I didn't see any evidence of him being in a

3  fight or falling down or any cuts on his hands and he

4  didn't show me any.

5       Q.    Did he appear to be injured to you?

6       A.    No.

7       Q.    Did he complain of any injuries to you?

8       A.    No.

9       Q.    Did you see a -- any dents in a car?

10      A.    No.  I didn't see any evidence of any

11  scuffle at all.

12      Q.    You said that he walked -- that once you --

13  am I understanding correctly once you had talked to

14  Mr. Boule, he quickly then went over to his car, got

15  the alien who had arrived and walked fast --

16      A.    He ran, ran him to the hotel.  He was

17  pushing him and running to the hotel to get him out of

18  there as quick as possible.

19           I don't know if Egbert had questioned the

20  alien or not.  I didn't know if the alien had --

21  Egbert had questioned the alien or not at that point.

22  I think Egbert and Olson had walked toward -- up to me

23  at that point as Boule walked away and grabbed the

24  alien and hurried him into the hotel.

25      Q.    When he was in a rush to get into the hotel,

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
1          A.     About this individual here?

2          Q.     Yes.

3          A.     About the alien?  No, no.  Mr. Boule told

4     Egbert that this guy was possibly illegally in the

5     country and he was somebody that we might want to talk

6     to.  But we had no visa or passport information for

7     this alien at all.

8          Q.     You agree that Agent Egbert had authority as

9     a Border Patrol agent under these circumstances to

10    enter Mr. Boule's property and investigate the alien?

11         A.     Yes.  That's probable cause.  The owner of

12    the hotel told him that he thinks that the -- the

13    person is illegal.  That's almost probable cause, if

14    not -- I don't know what's between reasonable

15    suspicion or probable cause, but that's pretty close

16    to it, you know.

17         Q.     Then on the next page of your report, on the

18    first paragraph, discusses the long documented history

19    of illegal and legal aliens at Mr. Boule's property,

20    correct?

21         A.     Yes.

22         Q.     Did you reach any conclusions about whether

23    Mr. Boule's accusation that Agent Egbert pushed him

24    was true?

25         A.     I didn't believe it was true based on what I
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

KENNETH ANDERSEN; June 01, 2018                                     60

1    saw at the -- at the hotel.  I mean, no injuries to

2    Mr. Boule.  I mean, he's an older guy and not in very

3    good shape, so I think if he would have been pushed

4    down on the ground or if there had been a -- any type

5    of confrontation, that he would shown some type of

6    injury or something, or shown me.

7              I've complained to -- I've responded to

8    citizen complaints before of agents putting their

9    hands on them for one reason or another and, you know,

10   people show injuries and you document it and take them

11   into the office and stuff like that and, you know, we

12   go through a process, the FBI is called, agent

13   assault, and stuff like that.  He didn't provide

14   anything like that, any evidence of any injuries.

15       Q.    So that process was not completed with --

16       A.    No.

17       Q.    -- respect to this --

18       A.    Huh-huh.

19       Q.    -- incident?

20             So you didn't trust that Mr. Boule was

21   telling the truth?

22       A.    No.

23       Q.    Do you know of other instances when

24   Mr. Boule has been dishonest?

25       A.    Other than him harboring illegal aliens.  I

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   because then he has no -- I mean, he didn't let them
 2   in theoretically, so he doesn't know they're in there,
 3   which we always thought was -- that was part of the
 4   agitate -- the aggravating part of the whole thing.
 5   If it's your house there and it's -- the international
 6   boundary's right there and aliens are constantly
 7   running into your -- the back door of your house and
 8   hiding in the downstairs part of your house, you would
 9   do something about it, a normal, reasonable person
10   would do something about it, but that didn't happen.
11   That's why we believed he was harboring aliens.
12        Q.    And what you described, aliens running
13   across the border and entering his home, that happened
14   on hundreds of occasions?
15        A.    It could be hundreds over ten years, I
16   suppose.  At least hundreds of people.  I don't know
17   exactly how many incidents.  But hundreds of people,
18   I'll go that far.
19        Q.    But it doesn't -- it wasn't just a handful
20   of occasions?
21        A.    No, it wasn't -- it wasn't unusual.  It was
22   common.
23        Q.    I don't need you to repeat anything you've
24   told me, I just want to make sure that I fully
25   understand your answer to this question.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1           So what is your opinion of Mr. Boule's

2    character for truthfulness?

3       A.    I wouldn't believe him.  I wouldn't

4    believe -- I think he's a liar.  I wouldn't believe

5    him if he was talking to me about something.

6       Q.    Do you know anything about what his

7    reputation for truthfulness is?

8       A.    I think if you talk to -- well, I don't know

9    about his reputation in the community, in Blaine or

10   anything like that.  But if you talk to an agent or

11   law enforcement, you'd -- you'd get -- probably get

12   the same opinion, that he's less than truthful, a

13   liar, and smuggling aliens, harboring aliens.

14      Q.    Have you heard Mr. Boule make accusations,

15   other than this incident, about Border Patrol agents

16   harassing him or his guests?

17      A.    I don't think so.  No, huh-huh.

18      Q.    Are you aware of any incidents, including

19   the one with Agent Egbert, where Mr. Boule was

20   harassed or where his guests were harassed?

21      A.    No.

22      Q.    And this is by anyone.  I'm curious if you

23   know about any harassment of Mr. Boule or his guests?

24      A.    No, I don't -- I don't remember anybody ever

25   harassing him or his guests.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1    between Mr. Boule and Agent Egbert about how

2    Border Patrol was going to interact with Mr. Boule and

3    be on his property?

4         A.    Yes, yes.

5         Q.    Can you remember anything -- so the date of

6    this email is March 28th of 2014 --

7         A.    Uh-huh.

8         Q.    -- is that correct?

9         A.    Yes.

10        Q.    Do you think there was anything before that

11   date telling Border Patrol agents about the agreement

12   reached with HSI in regards to when Border Patrol

13   would be on his property?

14        A.    There wasn't any, no.

15        Q.    So this would have been the first or one of

16   the first?

17        A.    ███████████████████████████████████

     ███████████████████████████████████████████████

     ███████████████████████████████████████████████

     █████████████████████████████

21        Q.    I didn't say this earlier, but I want to

22   make sure you know that Exhibit 3, which was your

23   report, as well as Exhibit 4, these are marked

24   confidential, so these are some of the documents you

25   can't discuss outside of this litigation.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                    (Audio was played.)
 2        Q.   (By Ms. Carsley)  Did Agent Egbert just say
 3   "Bravo ██, Bravo ██"?
 4        A.   Yes.
 5        Q.   Bravo ██ was your call sign?
 6        A.   Yes.
 7        Q.   So Bravo ██ was his?
 8        A.   Yes.
 9        Q.   I'll hit play again.
10                    (Audio was played.)
11        Q.   (By Ms. Carsley)  A voice said "Go ahead," is
12   that correct?
13        A.   That's me.
14        Q.   Okay.  I'm going to hit play one more time.
15                    (Audio was played.)
16        Q.   (By Ms. Carsley)  Did Agent Egbert say
17   "Mr. Boule is requesting your assistance here"?
18        A.   Yes, he did.
19        Q.   Was that the first time you were notified
20   that Mr. Boule had requested your assistance on his
21   property on March 20th of 2014?
22        A.   Yes.
23        Q.   Was that an unusual call to receive?
24        A.   The way he worded it it was unusual.  But
25   no, it wasn't unusual.  We respond to calls like that
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
1    you were -- I can play it again.
2         A.    Yeah, I'm sorry, I can't remember their call
3    sign.
4         Q.    That's fine.
5         A.    That was Blaine Sector Radio line, I
6    recognize the voice.
7         Q.    Okay.  And so the radio was also
8    requesting -- let me play it again.  I'm pressing play
9    one more time.
10                  (Audio was played.)
11        Q.   (By Ms. Carsley)  Was this call dispatch
12   requesting a supervisor respond to --
13        A.    Yeah.
14        Q.    -- Mr. Boule's property?
15        A.    Yes.
16        Q.    Was this an unusual call?
17        A.    I would say so, yeah.
18        Q.    The next radio clip I'm playing is entitled
19   CBP 10007.
20             Do you see that?
21        A.    Yes.
22                  (Audio was played.)
23        Q.   (By Ms. Carsley)  Do you know who the voices
24   are on this radio call?
25        A.    That's Olson, ████, and Egbert, ████.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.    And Olson was telling Egbert his location?
 2        A.    Yes.  He was telling him he was on his -- he
 3   said, "I'm close" or "I'm on my way.  Are you fine?
 4   Do you have any -- do you need me there fast?"  And
 5   then Egbert came back saying he was Code █, meaning
 6   that he didn't need him to respond as it was an
 7   emergency.
 8        Q.    When you're hearing Egbert's voice in that
 9   recording, does he appear to be in distress at all?
10        A.    No.
11        Q.    The next call I'm going to play is entitled
12   CBP 100010.
13              Do you see that?
14        A.    Yes.
15        Q.    I'll press play.
16                   (Audio was played.)
17        Q.   (By Ms. Carsley)  Do you know who Bravo █
18   is?
19        A.    I think that's Cole Addis, another
20   supervisor on dayshift.
21        Q.    Was Agent Addis also involved in this?
22        A.    No.  He was in the office.
23        Q.    So do you know why he'd be mentioned in a
24   recording?
25        A.    Well, he probably heard the call and he
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1        Q.    Do you remember at all what you were talking

2    about for that period of a time?

3        A.    He was just explaining to me what he -- what

4    had happened.  But I don't know why it would take so

5    long.  Probably talking about, you know, the reason

6    that Egbert was there.

7             And I can refer to my memo.  But explained

8    that Egbert told me earlier that he had -- you know,

9    him and Boule had talked and that the alien that was

10   going to show up to the Inn and we need to look at

11   him, and that, you know, Egbert, based on that, his

12   discussion, was down there to inspect the alien's

13   citizenship.  That's why we were down there.  We had

14   every right to be down there based on our authority

15   and also the cause -- the probable cause, the

16   reasonable suspicion that the alien was illegal.

17             I also have written down here that I

18   explained to him, based on the history of illegal

19   alien -- alien traffic in the area, that we also had

20   more than reasonable suspicion to be on his property.

21   That's about it.

22       Q.    Okay.  I'm going to hit play at the video

23   again at 1300, 17 minutes and 38 seconds, correct?

24       A.    Correct.

25                  (Video was played.)

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1          Q.    (By Mr. Boos)  So you and Mr. Egbert had
 2    talked about going -- about Mr. Egbert going to
 3    Mr. Boule's house to inspect an alien who was arriving
 4    that day?
 5          A.    Yes.
 6          Q.    Earlier that day you had talked about that?
 7          A.    Yes.
 8          Q.    How many times did you talk about that?
 9          A.    Once.
10          Q.    Okay.  Did you suggest to Mr. Egbert that he
11    might need a warrant?
12          A.    No.
13          Q.    Okay.  Would it have been possible for
14    Mr. Egbert to obtain the warrant?
15          A.    He didn't need a warrant.  If you have
16    reasonable suspicion to believe that there's illegal
17    activity or illegal aliens, you don't need -- you
18    don't need mere suspicion to question somebody walking
19    down the street, Border Patrol authority.
20                If a U.S. citizen -- if you approach a
21    U.S. citizen and they identify themselves as a
22    U.S. citizen, they don't have to talk to you.  But if
23    you believe somebody is an illegal alien or an alien,
24    you can question them as to their citizenship, and
25    they have to, you know, talk to you.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1    further questions, sir.  Thank you.

 2              THE WITNESS:  Thank you.

 3              MS. CARSLEY:  I just have a couple of quick

 4    follow-ups.

 5              THE WITNESS:  Okay.

 6

 7                      EXAMINATION

 8    BY MS. CARSLEY:

 9         Q.    It's true that Mr. Boule purports to operate

10    the Smuggler's Inn as a commercial enterprise,

11    correct?

12         A.    Yes.

13         Q.    And the driveway at the Smuggler's Inn is

14    open to the public?

15         A.    Yes.

16         Q.    Be it legitimate guests or illegitimate

17    guests?

18         A.    Yes.

19         Q.    And in fact, that driveway is shared between

20    the main house and the carriage house?

21         A.    Yes, and another property, a trailer across

22    the drive from it.  I don't think all that property

23    there is his.  But yeah, it's shared, it's a shared

24    driveway.

25         Q.    Okay.  And the driveway itself isn't private
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   in terms of anyone could see what's happening there?

2        A.     No, it's not private.

3        Q.     You testified earlier that Border Patrol

4   agents don't have a duty to stop illegal entry into

5   Canada.

6        A.     No.

7        Q.     But are there reasons why Border Patrol

8   agents would work to stop that even if it's not a

9   duty?

10       A.     Yes.  If they observe a crime happening and

11  somebody is trying to get away or running towards

12  Canada, then they would absolutely apprehend them,

13  person or people.

14       Q.     Do you know anything about, for example,

15  issues about the relationship between the

16  United States and Canada that would cause

17  Border Patrol to try to prevent illegal entry into

18  Canada?

19       A.     Well, it's more of a reporting thing to

20  Canada or assist them in surveilling areas.  Blaine

21  has done that before.  There was a -- there was a

22  group running guns into Canada from Blaine, so we

23  assisted them with that, arresting the gun-runners and

24  stuff like that.  We worked together pretty good.

25  There's a unit that works together, I can't remember

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1              CORRECTION & SIGNATURE PAGE
 2    RE: BOULE vs. EGBERT, ET AL.
 3         US DISTRICT COURT, WESTERN DISTRICT OF
 4         WASHINGTON, AT SEATTLE; No. 2:17-cv-00106-RSM
 5         KENNETH ANDERSEN; TAKEN JUNE 1, 2018
 6              Reported by: LESLIE POST, CCR No. 2378
 7              I, KENNETH ANDERSEN, have read the within
 8    transcript taken JUNE 1, 2018, and the same is true
 9    and accurate except for any changes and/or
10    corrections, if any, as follows:
11    PAGE/LINE            CORRECTION            REASON
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21         Signed at _____, Washington,
22    on this date: _____
23
24              _____
25                   KENNETH ANDERSEN
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                    REPORTER'S CERTIFICATE

 2         I, LESLIE POST, the undersigned Certified Court

 3    Reporter, pursuant to RCW 5.28.010, authorized to

 4    administer oaths and affirmations in and for the State

 5    of Washington, do hereby certify that the sworn

 6    testimony and/or proceedings, a transcript of which is

 7    attached, was given before me at the time and place

 8    stated therein; that any and/or all witness(es) were

 9    by me duly sworn to testify to the truth; that the

10    sworn testimony and/or proceedings were by me

11    stenographically recorded and transcribed under my

12    supervision, to the best of my ability; that the

13    foregoing transcript contains a full, true, and

14    accurate record of all the sworn testimony and/or

15    proceedings given and occurring at the time and place

16    stated in the transcript; that a review of which was

17    requested; that I am in no way related to any party to

18    the matter, nor to any counsel, nor do I have any

19    financial interest in the event of the cause.

20         WITNESS MY HAND AND SIGNATURE THIS 10TH DAY OF

21    JUNE 2018.

22

23    _____

24    LESLIE POST

25    Washington State Certified Court Reporter No. 2378
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1                 UNITED STATES DISTRICT COURT

2   FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3   _____

4   ROBERT BOULE,                    )
                                     )
5            Plaintiff,              )
                                     )
6        vs.                         ) No. 2:17-cv-00106-RSM
                                     )
7   ERIK EGBERT and JANE DOE         )
    EGBERT and their marital         )
8   community,                       )
                                     )
9            Defendants.             )

10  _____

11  ERIK EGBERT,                     )
                                     )
12           Counterclaimant,        )
                                     )
13       vs.                         )
                                     )
14  ROBERT BOULE,                    )
                                     )
15           Counterdefendant.       )
    _____

16

17      VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

18                     PHILIP OLSON

19                      VOLUME 2

20  _____

21                     2:03 P.M.

22                  JUNE 1, 2018

23                1431 SUNSET AVENUE

24              FERNDALE, WASHINGTON

25  REPORTED BY: LESLIE POST, CCR No. 2378

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**Exhibit C**

1          Do you understand that you're testifying

2   today pursuant to that subpoena?

3       A.    Yes.

4       Q.    I also will hand you another witness fee

5   check for an additional $40 for your attendance at

6   today's deposition which you're entitled to under

7   federal law.  And I will coordinate with Ms. Johnson

8   to get you the mileage reimbursement that you're

9   entitled to.

10      A.    I drove a government vehicle.  Don't worry

11  about it.

12      Q.    That makes it easy.

13          One of the subjects we're here to finish

14  your testimony about is Mr. Boule's relationship with

15  the Government.

16          Can you tell me what you know about

17  Mr. Boule's relationship with the Government?



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1              CORRECTION & SIGNATURE PAGE
 2   RE: BOULE vs. EGBERT, ET AL.
 3       US DISTRICT COURT, WESTERN DISTRICT, AT SEATTLE;
 4       No. 2:17-cv-00106 RSM
 5       PHILIP OLSON; TAKEN JUNE 1, 2018
 6            Reported by: LESLIE POST, CCR No. 2378
 7            I, PHILIP OLSON, have read the within
 8   transcript taken JUNE 1, 2018, and the same is true
 9   and accurate except for any changes and/or
10   corrections, if any, as follows:
11   PAGE/LINE            CORRECTION            REASON
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21       Signed at _____, Washington,
22   on this date: _____
23
24            _____
25                 PHILIP OLSON
```


206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1                    REPORTER'S CERTIFICATE

2         I, LESLIE POST, the undersigned Certified Court

3    Reporter, pursuant to RCW 5.28.010, authorized to

4    administer oaths and affirmations in and for the State

5    of Washington, do hereby certify that the sworn

6    testimony and/or proceedings, a transcript of which is

7    attached, was given before me at the time and place

8    stated therein; that any and/or all witness(es) were

9    by me duly sworn to testify to the truth; that the

10   sworn testimony and/or proceedings were by me

11   stenographically recorded and transcribed under my

12   supervision, to the best of my ability; that the

13   foregoing transcript contains a full, true, and

14   accurate record of all the sworn testimony and/or

15   proceedings given and occurring at the time and place

16   stated in the transcript; that a review of which was

17   requested; that I am in no way related to any party to

18   the matter, nor to any counsel, nor do I have any

19   financial interest in the event of the cause.

20        WITNESS MY HAND AND SIGNATURE THIS 7TH DAY OF

21   JUNE 2018.

22   

23   _____

24   LESLIE POST

25   Washington State Certified Court Reporter No. 2378

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com